1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Criminal No. 05CR1963 J |
| Plaintiff, ) | |
| v. ) | **ORDER GRANTING MOTION FOR COURT-ORDERED MEDICATION OF DEFENDANT [Doc. No. 53]** |
| JOSE ANTONIO JARAMILLO-AYALA, ) | |
| Defendant. ) | |

Before the Court is Plaintiff United States of America's ("Plaintiff" or "Government") Motion for Court-Ordered Medication of Defendant.  [Doc. No. 53.]  Defendant has filed Oppositions to Plaintiff's Motion.  [Doc. Nos. 49, 54.]  The Parties have also submitted supplemental briefing on this matter.  [Doc. Nos. 60, 63.]  The Court held evidentiary hearings on April 23, 2007, May 21, 2007, June 15, 2007, and June 22, 2007.  [Doc. Nos. 52, 55-57.]  For the reasons set forth below, the Court **GRANTS** Plaintiff's Motion for Court-Ordered Medication of Defendant.

//

//

1

*Background*

On September 24, 2005, Defendant was arrested near the U.S./Mexico international border for a potential violation of 8 U.S.C. § 1326.  (*See* Def.'s Suppl. Br. at 2.)  Plaintiff alleges that Defendant admitted that he was a citizen and national of Mexico, and that he had no documents allowing him to enter or remain in the United States.  (*See* Pl.'s Suppl. Br. at 2.)  On April 20, 2007, a superseding indictment was returned, alleging that Defendant had been found in the United States in violation of Sections 1326(a) and (b) subsequent to having been removed from the United States.  (*See id.*)  Following his arrest, Defendant was taken to the Alvarado Parkway Institute ("API") based on his admitted history of mental illness and substance abuse.  (*See* Def.'s Suppl. Br. at 2.)  While at API, Defendant was placed on Risperdal. (*See id.*)

On December 12, 2005, defense counsel moved for a competency evaluation of Defendant pursuant to 18 U.S.C. § 4241(a).  (*See id.* at 2.)  Dr. Gordon M. Zilberman, a psychologist at the Metropolitan Correctional Center in San Diego ("MCC"), diagnosed Defendant with Psychotic Disorder, Not Otherwise Specified, In Partial Remission, Alcohol Abuse, Prior History, and Amphetamine Abuse, Prior History.  During this time, Defendant agreed to take Risperdal and was returned to the general population unit.  (*See* Zilberman Report at 4-5.)  Dr. Zilberman opined that Defendant's "symptoms may worsen if he were to discontinue taking [the] prescribed medication."  (*See id.* at 5.)  Dr. Zilberman concluded that Defendant was competent to stand trial.  (*See id.* at 5-6.)

Dr. Bruce Yanofsky was appointed to conduct a second competency evaluation of Defendant.  (*See* Pl.'s Suppl. Br. at 4.)  Based on several interviews with Defendant, Dr. Yanofsky diagnosed Defendant with Psychotic Disorder, Not Otherwise Specified.  (*See* Yanofsky Report at 22.)  Defendant told Dr. Yanofsky that over his ten year prison sentence with the California Department of Corrections he was treated with antipsychotic medications, and during four of those years, he was involuntarily medicated.  (*See id.* at 8.)  However, Defendant stopped taking the antipsychotic medication once he was deported to Mexico.  (*See id.* at 8.)  Ultimately, Dr. Yanofsky found Defendant competent to stand trial.  (*See id.* at 24.)  Dr. Yanofsky concluded that Defendant was able to appreciate the charges against him, fully

appreciate the range of possible punishments that may be imposed, understand the adversary nature of the legal process, disclose pertinent facts to his attorney, present appropriate courtroom behavior, and present relevant testimony on his own behalf. (*See id.* at 23)  However, Dr. Yanofsky found that these factors were somewhat limited by Defendant's delusional thoughts. (*See id.*)  Dr. Yanofsky also noted that Defendant's condition seems to improve when on antipsychotic medication and that Defendant has discontinued the use of such medication. (*See id.* at 24).  Dr. Yanofsky submitted an addendum to his initial report after evaluating Defendant a month later.  Dr. Yanofsky found that Defendant's condition had deteriorated and Defendant was no longer competent to stand trial due to his major psychiatric disorder. (*See id.* at 27-28.)

On October 2, 2006, the Court held a competency hearing. [Doc. No. 32.]  During the hearing, Defendant interrupted the hearing several times and repeatedly demanded that the Court order the FBI and DEA to investigate his case and that his defense counsel be taken of his case. (*See* Oct. 2, 2006, Hr'g Tr. at 2-5.)  On October 10, 2006, the Court found Defendant not competent to stand trial and committed Defendant for four months to a federal medical facility for competency restoration.  (*See* Competency Order at 2.)

On December 15, 2006, Joseph McGuire, an attorney at the United States Medical Center for Federal Prisoners ("USMCFP") in Springfield, Missouri, wrote a letter to the Court indicating that Defendant required treatment with antipsychotic medication for competency restoration. (*See* Pl.'s Suppl. Br. at 7.)  On January 8, 2007, the Government moved for a hearing pursuant to *Sell v. United States*, 539 U.S. 166 (2003), to determine whether Defendant could be forcibly medicated for the sole purpose of restoring Defendant to competency to stand trial. [Doc. No. 37.]  On April 16, 2007, Defendant filed an Opposition to Plaintiff's oral Motion to Forcibly Medicate Defendant. [Doc. No. 49.]  On May 7, 2007, Plaintiff filed its Motion for Court-Ordered Medication of Defendant. [Doc. No. 53.]  On May 14, 2007, Defendant filed an Opposition to Plaintiff's written motion. [Doc. No. 54.]  The Court held evidentiary hearings on April 23, 2007, May 21, 2007, June 15, 2007, and June 22, 2007. [Doc. Nos. 52, 55-57.]  Dr. Lee Ann Preston and Dr. Robert Sarrazin, Chief of Psychiatry at USMCFP Springfield, testified for the Government, and Dr. Matthew Carroll, MD. testified for Defendant.

1   At the conclusion of the evidentiary hearings, the Parties submitted supplemental briefing.  [Doc.

2   Nos. 60, 63.]  This matter came on for closing statements on August 20, 2007.

3                                        ***Discussion***

4   **I.    *Harper* Analysis**

5           In a hearing on a motion for forced medication of a defendant to restore competency, a

6   court must initially consider whether the defendant may be involuntarily medicated on *Harper*-

7   type grounds, *i.e.*, an "individual's dangerousness or . . . [an] individual's own interests where

8   refusal to take drugs puts his health gravely at risk."  *See Sell v. United States*, 539 U.S. 166,

9   181-82 (2003) (citing *Washington v. Harper*, 494 U.S. 210, 225-26 (1990)).  For the reasons set

10  forth below, the Court **FINDS** that forced medication on *Harper*-type grounds is not appropriate

11  in this case.

12          Defendant currently does not present a danger to himself or to others, and medication is

13  not immediately necessary to protect Defendant's health.  Plaintiff states that in a December 15,

14  2006 letter, Mr. McGuire, the USMCFP-Springfield attorney, reported that Defendant's treating

15  doctors believed that Defendant was not currently a danger to himself or to others in the context

16  of his confinement, and Defendant did not require emergency medical intervention based on his

17  health.  (*See* Pl.'s Suppl. Br. at 8.)  Additionally, Defendant is currently in a locked housing unit

18  in a single cell.  (*See* April 23, 2007, Hr'g Tr. at 10.)  Dr. Preston also testified that Defendant is

19  uncooperative in the sense that he is unwilling to speak to staff and he is very withdrawn.  (*See*

20  *id*. at 43.)  Dr. Preston testified that since Defendant has been at the Springfield facility, no

21  altercations or problems involving Defendant have been reported.  (*See id*.)

22          Defense counsel agrees that Defendant is not in a position to be medicated due to the

23  danger to himself or to others.  Defense counsel states that "this preliminary finding is a simple

24  one to make:  the medical professionals have repeatedly opined that Mr. Jaramillo-Ayala is not

25  dangerous to himself or others; thus, if appropriate at all, forced medication could only be

26  authorized for the sole purpose of restoring Mr. Jaramillo-Ayala to competency."  (Def.'s April

27  16, 2007, Opp'n at 5.)

28

4

1    Accordingly, the Court **FINDS** that the forced medication of Defendant on *Harper*-type

2    grounds is not appropriate.

3    **II.    _Sell_ Analysis**

4         **A.    *Legal Standard***

5         Having concluded that Defendant may not be medicated based on *Harper*-type grounds,

6    the Court now turns to the analysis provided in *Sell*.  It is well settled law that a defendant

7    "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic

8    drugs under the Due Process Clause of the Fourteenth Amendment."  *Washington v. Harper*, 494

9    U.S. 210, 221-22 (1990); *see also Riggins v. Nevada*, 504 U.S. 127, 134 (1992) (repeating that

10   an individual has a constitutionally protected liberty interest in avoiding involuntary

11   administration of antipsychotic drugs, an interest that only an "essential" or "overriding" state

12   interest might overcome).  However, in *Sell*, the Supreme Court held that the Government may

13   involuntarily administer antipsychotic drugs to a mentally ill defendant to render the defendant

14   competent to stand trial under certain circumstances.  *Sell*, 539 U.S. 166.  Specifically, the Court

15   held that

16         [T]he Constitution permits the Government involuntarily to administer antipsychotic
          drugs to a mentally ill defendant facing serious criminal charges in order to render
17        that defendant competent to stand trial, but only if the treatment is medically
          appropriate, is substantially unlikely to have side effects that may undermine the
18        fairness of the trial, and, taking account of less intrusive alternatives, it is necessary
          significantly to further important governmental trial-related interests.
19

20   *Id.*  Though the Supreme Court cautioned that "[t]his standard will permit involuntary

21   administration of drugs solely for trial competence purposes in *certain instances*," and "those

22   instances may be *rare*."  *Id*. at 180 (emphasis added).  In order to override the defendant's

23   constitutionally protected rights, (1) the court must find that "*important* governmental interests

24   are at stake[;]" (2) the court must conclude that "involuntary medication will *significantly* further

25   those concomitant state interests[;]" (3) the court must conclude that "involuntary medication is

26   *necessary* to further those interests[;]" and (4) the court must conclude that "administration of

27   the drugs is *medically appropriate, i.e.*, in the patient's best medical interest in light of his

28   medical condition."  *Id*. at 180-81 (emphasis in original).  For the reasons discussed below, the

1    Court **FINDS** that the Government has satisfied the standard set forth in *Sell* for forcibly

2    medicating Defendant to restore competency for trial.

3    **B.    *Burden of Proof***

4    "The function of a standard of proof, as that concept is embodied in the Due Process

5    Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of

6    confidence our society thinks he should have in the correctness of factual conclusions for a

7    particular type of adjudication.' " *Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261,

8    282 (1990) (quoting *Addington v. Texas*, 441 U.S. 418, 423 (1979)).  In *Harper*, the Supreme

9    Court considered a Washington state law authorizing forced administration of antipsychotic

10   drugs without a judicial hearing "to inmates who are . . . gravely disabled or represent a

11   significant danger to themselves or others."  494 U.S. at 226.  In that context, the Court rejected

12   the use of the clear and convincing standard of proof because "[t]his standard is neither required

13   nor helpful when medical personnel are making the judgment required by the regulations here."

14   *Id.* at 235.

15   In *United States v. Brandon*, 158 F.3d 947 (6th Cir. 1998), the Sixth Circuit addressed the

16   standard of proof by which the Government must prove its case to forcibly medicate a non-

17   dangerous pretrial detainee to render him competent to stand trial.  There, the Sixth Circuit

18   concluded that a clear and convincing evidence standard is the appropriate standard of proof.  *Id.*

19   at 961.  The Sixth Circuit explained:

20   We believe that the risk of error and possible harm involved in deciding whether to
     forcibly medicate an incompetent, non-dangerous pretrial detainee are likewise so
21   substantial as to require the government to prove its case by clear and convincing
     evidence.  Given the current risks associated with the administration of antipsychotic
22   medication, no other standard would sufficiently protect [the defendant's] rights.

23   *Id.*  (internal citations omitted); *see also Addington*, 441 U.S. at 432 (requiring the Government

24   to prove by clear and convincing evidence that an individual is mentally ill before an individual

25   may be civilly committed); *Santosky v. Kramer*, 455 U.S. 745, 757-58 (1982) (applying a clear

26   and convincing evidence standard before a state may sever completely and irrevocably the rights

27   of parents in their natural child); *Cruzan*, 497 U.S. at 282 (requiring a clear and convincing

28

6

evidence standard before terminating an incompetent individual's life-sustaining treatment).  In

distinguishing *Harper*, the Sixth Circuit added:

> Although this higher burden of proof was rejected in *Harper*, it was done in a context inapposite to the present case.  In *Harper*, the Supreme Court held that the decision to medicate a dangerous convicted felon could be made solely by medical professionals without the need for a judicial hearing.  Based on that fact, the Court concluded it would make no sense to require medical professionals to convince themselves of the medical appropriateness of their own decision by clear and convincing evidence.  Here, however, we are dealing with a non-dangerous pretrial detainee, where a judge must conduct an evidentiary hearing on the forced-medication issue . . . .  Therefore, *Harper*'s reasoning does not apply to the facts of this case.

*Brandon*, 158 F.3d at 961; *see also United States v. Cruz-Martinez*, 436 F. Supp. 2d 1157, 1160

(S.D. Cal. 2006) (adopting the clear and convincing standard under the *Sell* analysis); United

*States v. Gomes*, 387 F.3d 157, 160 (2d Cir. 2004) (recognizing that the proper standard is by

clear and convincing evidence); *United States v. Weston*, 255 F.3d 873, 880 n.5 (D.C. Cir. 2001)

("The district court held the government to a clear-and-convincing-evidence burden of proof.")

In *Addington*, the Supreme Court considered "both the extent of the individual's interest

in not being involuntarily confined indefinitely and the state's interest in committing the

emotionally disturbed under a particular standard of proof."  441 U.S. at 425.  Expressing

concerns about the possible risk of improperly committing an individual and the seriousness of

the loss of liberty, the *Addington* Court determined that "increasing the burden of proof is one

way to impress the factfinder with the importance of the decision and thereby perhaps to reduce

the chances that inappropriate commitments will be ordered."  441 U.S. at 427.  The Court

further noted:

> The individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state.  We conclude that the individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence.

*Id.*

While Defendant has a constitutionally protected liberty interest in avoiding involuntary

administration of antipsychotic drugs, the primary governmental purpose for medicating

Defendant is to render him competent to stand trial for illegal reentry after removal.  The

Supreme Court recognizes that the "power to bring an accused to trial is fundamental to a

1    scheme of 'ordered liberty' and prerequisite to social justice and peace." *Riggins*, 504 U.S. at

2    136 (quoting *Illinois v. Allen*, 397 U.S. 337, 347 (1970) (Brennan, J. concurring)) (internal

3    quotations omitted).  Nevertheless, due to the serious side effects that may occur from the use of

4    antipsychotic medication, using a clear and convincing evidence standard is certainly one way to

5    ensure that the involuntary administration of medication is appropriate under the circumstances.

6    Similar to civil commitment, and perhaps even more so in this context, the defendant should not

7    equally share the risk of error with the Government, as the potential dangers of antipsychotic

8    medication and its effects on the chemical balance in a patient's brain exceed any possible harm

9    to the state.  Accordingly, the Court holds the Government to a clear and convincing evidence

10   standard.

11            **B.    *Governmental Interest in Prosecuting Defendant***

12            In conducting a *Sell* analysis, the Court must first "find that *important* governmental

13   interests are at stake." *Sell*, 539 U.S. at 180 (emphasis in original).  The Government argues that

14   Defendant is charged with a serious crime based on the fact that the violation entitles him to a

15   jury trial, he faces a twenty-year maximum penalty and a 100-125 month advisory sentencing

16   range, and he has a long criminal history.  (*See generally* Pl.'s May 8, 2007, Mot.)  Defendant,

17   however, argues that the  Government misinterprets the *Sell* standard by failing to recognize that

18   "serious crimes" are limited to those against the person or property and by incorrectly suggesting

19   that a person's criminal history should be considered.  (*See* Def.'s May 14, 2007, Opp'n at 3.)

20            As briefed by the Parties, the difficulty in assessing the meaning of a "serious crime" for

21   forced medication purposes is due to the lack of specificity within the *Sell* opinion and the dearth

22   of subsequent case law dealing with this issue.  The extent of the Supreme Court's delineation of

23   its meaning in *Sell* is the following:

24            [A] court must find that important governmental interests are at stake.   The
             Government's interest in bringing to trial an individual accused of a serious crime is
25           important.  That is so whether the offense is a serious crime against the person or a
             serious crime against property.  In both instances the Government seeks to protect
26           through application of the criminal law the basic human need for security.

27   *Sell*, 539 U.S. 180.  Additionally, "Courts . . . must consider the facts of the individual case in

28   evaluating the Government's interest in prosecution," as "[s]pecial circumstances may lessen the

8

1  importance of that interest." *Id.* While *Sell* is of little help to the Court in addressing the current

2  charges, the Court **FINDS** that the Government has an important interest in bringing Defendant

3  to trial and Defendant is charged with a "serious crime" for purposes of a *Sell* hearing.

### 1. *Duncan* is Inapplicable to the *Sell* Standard

5  Plaintiff argues that the Court should consider the "serious crime" requirement within the

6  context of the Sixth Amendment right to a jury trial as provided by *Duncan v. Louisiana*, 391

7  U.S. 145 (1968). For the reasons discussed below, the Court **FINDS** that the *Duncan* definition

8  of a "serious crime" is inapplicable to the forced medication context.

9  In *United States v. Evans*, the defendant was in the custody of the Attorney General in an

10  attempt to restore competency to stand trail under 18 U.S.C. § 4241(d)(1). 293 F. Supp. 2d 668,

11  669-70 (W.D. Va. 2003). There, the defendant "was arrested on a misdemeanor charge of

12  "assault[ing], resist[ing], or [impeding] [an employee of the USDA]" under 18 U.S.C. §

13  111(a)(1)," and was also later charged with violating 18 U.S.C. § 115(a)(1)(B) for "threaten[ing]

14  to murder a United States judge, with intent to retaliate against such judge, on account of the

15  performance of official duties." *United States v. Evans*, 404 F.3d 227, 233-34 (4th Cir. 2005).

16  In order to determine whether such an offense was a "serious" crime, the Fourth Circuit looked

17  to jurisprudence relating to what amounts to a serious crime within the context of the Sixth

18  Amendment right to a jury trial, as well as the maximum penalty attached to the offense. *See id.*

19  at 237. The Fourth Circuit recognized that the Sixth Amendment right to a jury trial extends

20  only to persons charged with serious crimes, *i.e.,* those offenses for which a term of

21  imprisonment exceeding six months may be imposed. *See id.* at 237-38  (citing *Duncan v.*

22  *Louisiana*, 391 U.S. 145, 154-55, 159 (1968); *Baldwin v. New York*, 399 U.S. 66, 68-69 (1970)).

23  The Fourth Circuit found "it beyond dispute that the Government does have an important interest

24  in trying a defendant charged with a felony carrying a maximum punishment of 10 years

25  imprisonment." *Id.* at 238.

26  However, the jury trial standard cannot be appropriately applied within a *Sell* analysis.

27  First, the Supreme Court in *Sell* did not mention *Duncan* or even analogize the definition of a

28  "serious crime" with that of any offense warranting a jury trial. Second, if the *Duncan* standard

were to apply, situations in which the *Sell* analysis could apply would cease to be "rare" and "limited" as prescribed by the Supreme Court.  As Defendant points out, such an expansion of the meaning would apply to a wide variety of cases, thus nullifying the Supreme Court's indication that such situations should be limited.  (*See* Def.'s May 14, 2007, Opp'n at 5.)  Defendant notes that crimes such as making a false statement to a federal officer, making a false claim for United States citizenship, or tampering with an odometer would meet the *Duncan* standard.  (*See id.*)  Third and most important, the interests sought to be advanced in *Sell* and in *Duncan* are diametrically opposed.  In *Duncan*, the Supreme Court sought to provide a broad protection to criminal defendants by ensuring that they be tried by a jury of their peers.  The Court in *Sell*, however, provided the standard by which the Government may supersede a defendant's due process right to not be forcibly medicated.  "As such, a 'serious' crime is defined relative to the interested party[—]in the case of jury trials, the defendant[;] in the case of involuntary medication, the government."  *United States v. Barajas-Torres*, 2004 WL 1598914, *3 (W.D. Tex. 2004) (finding the charge of illegal reentry without an apparent criminal history to not be a "serious crime" within the meaning of *Sell* as it is not a crime against the person or property).

Accordingly, for the reasons that the *Duncan* standard is broad, the *Sell* standard is narrow—both seek to curb the risk of oppressive governmental conduct.  Thus, "[g]iven the divergent interest implicated in the two analyses, the definition . . . is not interchangeable."  *Barajas-Torres*, 2004 WL 1598914, at *3.

### 2.    Seriousness of the Crime and Criminal History

Plaintiff also argues that the Supreme Court's instruction in *Sell* that the court should "consider the facts of the individual case in evaluating the Government's interest in prosecution" implies that the court should consider a defendant's criminal history and the possible penalty that may be imposed and should not limit the *Sell* inquiry to crimes against a person or property.  (*See* Pl.'s Suppl. Br. at 11-16.)  Defendant argues that "serious crimes" should be limited to those against the person or property and that a person's criminal history is not relevant in a *Sell* inquiry.  (*See* Def.'s May 14, 2007, Opp'n at 3.)

However, Plaintiff interprets this language too broadly.  The Supreme Court states that:

> Courts, however, must consider the facts of the individual case in evaluating the Government's interest in prosecution. Special circumstances may lessen the importance of that interest. The defendant's failure to take drugs voluntarily, for example, may mean lengthy confinement in an institution for the mentally ill-and that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime. We do not mean to suggest that civil commitment is a substitute for a criminal trial. The Government has a substantial interest in timely prosecution. And it may be difficult or impossible to try a defendant who regains competence after years of commitment during which memories may fade and evidence may be lost. The potential for future confinement affects, but does not totally undermine, the strength of the need for prosecution. The same is true of the possibility that the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed, see 18 U.S.C. § 3585(b)).

*Sell*, 539 U.S. at 180.  Accordingly, a reading of *Sell* indicates that the Court intended to instruct courts to consider individual facts to determine whether the government's interest is lessened. Facts of individual cases can lessen the government's interest by demonstrating, for example, that it would take years to bring a person to competence in order to stand trial or that by the time of trial the defendant would qualify to be released on time served.

However, in *United States v. Valenzuela-Puentes*, the Tenth Circuit indicated that "[w]hether a crime is 'serious' relates to the possible penalty the defendant faces if convicted, as well as the nature or effect of the underlying conduct for which he was charged."  479 U.S. 1220, 1226 (10th Cir. 2007).  In evaluating whether the maximum penalty and advisory guideline range makes the crime charged "serious," the Tenth Circuit also considered the defendant's "long criminal history" and the fact that he was a recidivist as factors that increase the government's interest in prosecuting the defendant.  *See id*.  The Tenth Circuit, thus, found that the defendant was charged with a serious crime, "despite there being no indication that the conduct for which he was charged was violent or harmful to others."  *Id*. at 1226-27.

Additionally, it is important to note that in a recent, unpublished opinion, the Ninth Circuit indicated that a defendant's criminal history is relevant in evaluating the government's

interest.[1]  *See United States v. Espinoza-Pareda*, No. 06-50699, 2007 WL 901049, at *1 (9th Cir. Mar. 27, 2007) (remanding case for a general failure to make findings pursuant to *Harper* and *Sell*).  The Ninth Circuit stated that the defendant's "criminal history and the particular circumstances leading up to her arrest and indictment no doubt bear on the importance of the government's interest in bringing her to trial, because the nature of the offense and characteristics of the offender shed light on the seriousness of the crime."  *Id.*  However, while the Ninth Circuit indicated that it "bears on" and "sheds light on" the seriousness of the crime, it gave no specificity as to the extent of criminal history or characteristics of the offender necessary to render a crime serious.  A rule that simply indicates a broad consideration of criminal history fails to recognize a defendant's liberty interest against forced medication and the Supreme Court's caution that this should apply in limited circumstances.

While the Court is acutely aware of the significant liberty interests at stake, the Court cannot rationally evaluate the circumstances of Defendant's case within a vacuum.  However, for the reasons discussed above, the Court declines to adopt a sweeping view of *Sell* that would allow the Court to consider broad factors such as the possible or maximum penalty imposed, whether Defendant would have a right to a jury trial, or all of Defendant's criminal history.  Fundamentally, the Court recognizes the Government's interest in protecting "through application of the criminal law the basic human need for security."  *Sell*, 539 U.S. at 180.  Yet, the lack of elucidation of the meaning of "serious crime" in *Sell* or in subsequent Ninth Circuit opinions requires the Court to limit itself to a review of the charged offenses or portions of Defendant's criminal history that constitute serious crimes against the person or serious crimes against property as set forth in *Sell*, in order to err on the side of protecting Defendant's due process rights.  *See id.*  Such limitation allows the Court to preserve the Supreme Court's admonishment that cases in which a defendant may be forcibly medicated to restore competency for trial should be limited and rare, while providing the Court with a realistic opportunity to evaluate whether the Government has an important interest in protecting the community.

---

[1] Recognizing that there is no Ninth Circuit opinion directly addressing the "serious crime" issue with respect to criminal history, the Court looks to the unpublished opinion in *Espinoza-Pareda* solely for guidance and not as controlling authority or precedent.  *See* 9th Cir. R. 36-3.

Here, Defendant has a long history of serious offenses against the person and property. Based on the circumstances of Defendant's case, the Government meets even the narrow test employed by the Court.  Needless to say, the Government would also meet the broader tests used by other circuits.  *See Valenzuela-Puentes*, 479 F.3d at 1226 (possible penalty and the nature or effect of the underlying conduct); *Evans*, 404 F.3d at 238 (Sixth Amendment right to a jury trial and maximum punishment).  Defendant has been indicted for a violation of 8 U.S.C. § 1326(a) and (b) for having been found in the United States after having been excluded, deported, and removed from the United States to Mexico.  (*See* April 20, 2007 Superseding Indictment.) According to the Government, Defendant was ordered deported from the United States on February 25, 1995 and has been removed from the United States on four occasions – December 16, 1987, February 25, 1994, November 16, 1995, and February 28, 2005.  In 1985, Defendant was convicted of burglary and sentenced to 180 days in jail and 36 months probation.  (*See* April 23, 2007, Add'l Docs. at 2.)  In 1989, Defendant was convicted of vehicle theft and received sixty days in jail and twenty-four months probation.  (*See id*.)  In 1991, Defendant was again convicted of vehicle theft.  (*See id*.)  In 1992, Defendant was convicted of escape from jail and his probation was revoked.  (*See id*.)  That same year, Defendant was also convicted of second degree burglary and vehicle theft, receiving thirty-six months probation and thirty months in custody, respectively.  (*See id*.)  In 1996, Defendant was convicted of carjacking involving the use of a firearm and kidnapping and received ten years in prison served concurrently.  (*See id*.)

The nature of Defendant's charge under Section 1326 is Defendant's illegal reentry after having been removed subsequent to a conviction for the commission of an aggravated felony. The characteristics of Defendant no doubt bear here on the seriousness of Defendants illegal reentry.  Defendant has been removed four times and has a long track record of committing serious crimes against the person and property, culminating in Defendant's most recent conviction for carjacking with the use of a firearm and kidnapping.  The Court cannot turn a blind eye to the obvious need to protect the community from a recurrence of such serious criminal conduct.  The Court is not disregarding the charged offense itself, but recognizes that the charged offense is related to Defendant's serious and recidivistic criminal history.  While a

Section 1326 violation alone (or even repeated Section 1326 violations) would not constitute a serious crime, Defendant is charged with illegal reentry subsequent to the commission of aggravated felonies against persons and property, which the Court finds constitutes a serious crime for *Sell* purposes.  Accordingly, the Court **FINDS** that important governmental interests are at stake.

Lastly, Defendant argues that special circumstances lessen the Government's interest and thus, counsel against forced medication.  (*See* Def.'s Suppl. Br. at 15.)  As described above, the Court must consider facts that may lessen this interest such as a "defendant's failure to take drugs voluntarily . . . , [which] may mean lengthy confinement in an institution for the mentally ill and that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime," the difficulty in trying "a defendant who regains competence after years of commitment during which memories may fade and evidence may be lost," or "the possibility that the defendant has already been confined for a significant amount of time."  *Sell*, 539 U.S. at 180.  Defendant argues that he "has already spent in excess of 20 months in pretrial detention and if forcibly medicated, he will spend a minimum of four additional months if he can even be restored to competency under a forced medication regimen."  (*See* Def.'s Suppl. Br. at 15.)

However, whether Defendant faces a maximum penalty of 20 years (or 10 years as disputed by Defendant) or an advisory sentencing range of 100-125 months, Defendant's likely sentence if convicted is still significantly longer than the time already spent in custody.  Additionally, there is no indication that Defendant's length of confinement would diminish memories or that evidence is a risk of being lost.  In fact, evidence in a Section 1326 conviction generally relies primarily on documentary evidence in a defendant's immigration file.  Lastly, if Defendant is not restored to competency for trial, it is unlikely that he will continue to be committed, but would rather be turned over for deportation.  Thus, the Court **FINDS** that the Government's interest has not diminished to the point of counseling against forced medication.

14

1    Accordingly, the Court **FINDS** that the Government has an important interest in bringing

2    Defendant to trial and Defendant is charged with a "serious crime" for purposes of a *Sell*

3    hearing.

4    **C.      *Likelihood of Rendering Defendant Competent to Stand Trial and Potential Side
         Effects***

5    The Court must next "conclude that involuntary medication will *significantly further*

6    those concomitant state interests." *Sell*, 539 U.S. at 181 (emphasis in original).  In addition, the

7    Court "must find that administration of the drugs is substantially likely to render the defendant

8    competent to stand trial[,]" and "[a]t the same time, it must find that administration of the drugs

9    is substantially unlikely to have side effects that will interfere significantly with the defendant's

10   ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Id.*

11   Recognizing the "importance of the defendant's liberty interest, the powerful and permanent

12   effects of anti-psychotic medications, and the strong possibility that a defendant's trial will be

13   adversely affected by the drug's side-effects all counsel in favor of ensuring that an involuntary

14   medication order is issued only after both sides have had a fair opportunity to present their case

15   and develop a complete and reliable record." *United States v. Rivera-Guerrero*, 426 F.3d 1130,

16   1138 (9th Cir. 2005).  "While it is unclear what the exact percentage chance of success should

17   be, a court in the Southern District of California has held that a 50 percent probability of success

18   is insufficient." *United States v. Cruz-Martinez*, 436 F. Supp. 2d 1157, 1160 (S.D. Cal. 2006)

19   (citing *United States v. Rivera-Morales*, 365 F. Supp. 2d 1139, 1141 (S.D. Cal. 2005)).

20   However, an "80 percent chance of success appears to be sufficient." *Id.* (citing *United States v.*

21   *Bradley*, 417 F.3d 1107, 1115 (10th Cir. 2005)).  "Also, the Court must examine closely the

22   government's expert testimony, in particular, its reasoning and conclusions," and "[c]onclusory

23   statements by the government's experts that antipsychotic drugs are substantially likely to render

24   a defendant competent are inadequate." *Id.* (citing *United States v. Evans*, 404 F.3d 227, 233-34,

25   242-43 (4th Cir. 2005)).  For the reasons discussed below, the Court **FINDS** that the

26   Government has demonstrated by clear and convincing evidence that involuntary medication is

27   substantially likely to render Defendant competent to stand trial and it is unlikely that the

28

possible side effects will interfere significantly with Defendant's ability to assist counsel during trial.

At the April 23, 2007 hearing, Dr. Preston testified that during her initial interview of Defendant, Defendant "demonstrated prominent psychotic symptoms; that is, he expressed the paranoid delusional belief that people were attempting to harm him and reported that he could hear them talking about him." (Apr. 23, 2007, Hr'g Tr. at 8.) At that time, Dr. Preston indicated that she "offered the diagnosis of psychotic disorder not otherwise specified," which "is a type of psychotic disorder that is used when there is little information regarding a person's history available and . . . as a result, a person is unable to determine which type of psychotic disorder best fits." (*Id*. at 9.) Based on the ongoing treatment and encounters with Defendant since that initial interview, Dr. Preston testified that "with continuing observations and review of the records, [she found] that a more appropriate diagnosis is likely paranoid schizophrenia." (*See id*. at 12.) Specifically, Dr. Preston stated that her initial concern was psychotic symptoms combined with manic symptoms, but that "with several months of observation, there is no indication that he has been manic during that time, and it appears that his hallucinations and paranoid delusions are the prominent symptoms." (*See id*. at 12-13.) "Those two symptoms are the most consistent with the diagnosis of paranoid schizophrenia." (*See id*. at 13.) Dr. Preston indicated that this is not necessarily a different diagnosis, but rather a "more refined diagnosis." (*See id*. at 39.) Dr. Sarrazin testified that he found the revised diagnosis to be appropriate based on his continued experience of paranoid delusions as well as reported auditory hallucinations, which "all fits into the diagnosis of chronic paranoid schizophrenia." (*See id*. at 63.)

Both of Plaintiff's experts, Dr. Preston and Dr. Sarrazin, testified that involuntary treatment with antipsychotic medication is substantially likely to restore Defendant to competency. (*See id*. at 14, 64.) As discussed in further detail below, the opinions of Dr. Preston and Dr. Sarrazin are based on a previous study, statistical compilations, Defendant's history, interactions with Defendant, and the personal experience of each expert.

As an initial matter, it is important to note that Defendant has responded positively to antipsychotic medication, specifically, Risperdal, in the past. Defendant has also previously

expressed a willingness to take Risperdal.  Dr. Sarrazin testified that at Defendant's initial
interview, Defendant agreed to take Risperdal at that time and that he had discussed the potential
side effects of Risperdal.  (*See id*. at 58.)  Dr. Sarrazin's review of the record indicated that it
was unclear whether Defendant actually took one dose, but that Defendant subsequently refused
to continue taking the medication.  (*See id*. at 58; May 21, 2007, Hr'g Tr. at 50-51.)  However,
Dr. Sarrazin testified that based on the information received from psychologists at the San Diego
institution, Defendant had previously voluntarily taken Risperdal and was "competent to proceed
when he was taking Risperdal."  (Apr. 23, 2007, Hr'g Tr. at 63.)  Thus, Dr. Sarrazin
recommended that Defendant be medicated beginning with Risperdal since he has "a history that
shows that he tolerated the medication and that he responded to it to the point where the
psychologists felt that he was competent to proceed."  (*Id.* at 65, 56 ("some evidence from prior
evaluations that, at 4 milligrams [of Risperdal] a day, Mr. Jaramillo was found to be
competent."))

     "As the Supreme Court has explained, at a *Sell* hearing the court is required to consider
specific drugs, their unique side effects, and their medical appropriateness.  Specificity as to the
medications to be administered is critical."  *Rivera-Guerrero*, 426 F.3d at 1140 (citing *Sell*, 539
U.S. at 181 ("The specific kinds of drugs at issue may matter . . . [because d]ifferent kinds of
anti-psychotic drugs may produce different side effects and enjoy different levels of success."
(emphasis added)); *id.* at 185 ("Whether a particular drug will tend to sedate a defendant,
interfere with communication with counsel, prevent rapid reaction to trial developments, or
diminish the ability to express emotions are matters important in determining the permissibility
of medication to restore competence.") (citing *Riggins*, 504 U.S. at 142-45) (emphasis added)).
Accordingly, Dr. Sarrazin has provided a specific treatment plan.  Dr. Sarrazin testified that he
plans to first attempt medicating Defendant with Risperdal at a dosage of one milligram per day,
escalating the dose over time to four milligrams a day.  (*See id*. at 67.)  Dr. Sarrazin intends to
escalate the dosage slowly due to the side effects, such as sedation, dry mouth, and constipation,
that people may experience if the dose is escalated too quickly.  (*See id*.)  If Defendant did not
respond to the Risperdal or experienced side effects, Dr. Sarrazin would recommend another

1  second generation medication antipsychotic, such as Geodon or Abilify.[2]  (*See id*. at 65.)  Dr.

2  Sarrazin also testified that based on Defendant's past willingness (at least initially) to take

3  Risperdal orally, he would attempt to discuss the Court order with Defendant and persuade

4  Defendant to take the medication.  (*See id*. at 65-66.)  However, if Defendant does not comply,

5  Dr. Sarrazin testified that it may be necessary to use an intermuscular injectable medication,

6  such as Haloperidol or Haldol.  (*See id*. at 66.)  Dr. Sarrazin recommended starting with a dose

7  of five milligrams of Haldol.  (*See id*. at 67.)  If an injection of Haldol is necessary, Dr. Sarrazin

8  intends to again offer the Risperdal the next day.  (*See id*. at 66.)  If after three to four days of

9  requiring an injectable medication Defendant is still not agreeing to take the oral medication, Dr.

10  Sarrazin recommended switching to the long-acting Haloperidol, which only needs to be injected

11  every two to four weeks.  (*See id*. at 67.)  Dr. Preston and Dr. Sarrazin agreed that it would likely

12  take between four to eight months to restore Defendant to competency.  (*See id*. at 64.)

13      Dr. Preston also testified as to the support for her opinion that Defendant can be restored

14  to competency.  Dr. Preston first cited to a 1993 study from the American Academy of

15  Psychiatry and the Law which found that out of a sample of 68 patients that were treated with

16  antipsychotic medication, 87 percent were restored to competency.  (*See id*. at 15.)  Forty-five

17  out of the sixty-eight patients were treated involuntarily.  (*See* June 22, 2007, Hr'g Tr. at 29.)

18  Dr. Preston also testified as to a 2003 Federal Bureau of Prisons' study that showed that out of

19  285 patients, only 15 percent were not restored to competency with treatment.  (*See* Apr. 23,

20  2007, Hr'g Tr. at 15.)  Dr. Preston testified that 59 of the 285 patients required involuntary

21  medication and approximately 75 percent of those involuntarily medicated were restored to

22  competency.  (*See* June 22, 2007, Hr'g Tr. at 31.)

23  _____

24  [2] "Anti-psychotic medication is currently divided into two categories:  'typicals' [or first-generation]
and 'atypicals' [or second-generation].  Typicals are older medications that were relied upon extensively

25  during the latter half of the 20th century to treat psychosis.  Atypicals are the next generation of
anti-psychotics.  There is some evidence that atypicals cause less side-effects than typicals.  However,
some believe that atypicals are at best no better than the typicals, and at worst, responsible for a

26  different set of potentially more dangerous side-effects."  *Rivera-Guerrero*, 426 F.3d at 1135 n.2.  First-
generation antipsychotic medication includes Haldol and Haloperidol and second general antipsychotic

27  medication includes Risperdal.  Dr. Sarrazin testified that second-generation antipsychotic medications
were developed largely to avoid the side effects caused by first-generation antipsychotic medications,

28  and that first-generation antipsychotic medications have a greater incidence of side effects than second-
generation medications.  (*See* May 21, 2007, Hr'g Tr. at 20-21.)

18

Dr. Preston also testified as to her own success rate on the individual cases she has overseen and analyzed her data based on categorical limitations.  Dr. Preston testified that out of 76 patients, 58 were treated with medication.  (*See id.* at 10.)  Out of those 58 patients, 51 (or 87 percent) were restored to competency.  (*See id.*)  Further, out of those 58 patients, 27 were involuntarily medicated, and 20 (or 74 percent) out of these 27 individuals were restored to competency.  (*See id.* at 11.)  Nine of Dr. Preston's patients were both diagnosed with Defendant's diagnosis, paranoid schizophrenia, and Dr. Preston had a 100 percent success rate in restoring this group to competency.  (*See id.* at 12.)  All three of the nine patients diagnosed with paranoid schizophrenia that were involuntarily medicated were restored to competency.  (*See id.* at 12-13.)  Additionally, 26 of her patients were treated with Haldol, and 22 out of the 26 were restored to competency.  (*See id.* at 16.)  Eighteen of those treated with Haldol were treated involuntarily, and 14 out of these 18 patients were restored to competency.  (*See id.* at 20.)  However, Dr. Preston was only definitively aware of seven patients that were put on medication solely for purposes of restoring competency under *Sell*.[3]  (*See id.* at 37.)  Out of these 7, 5 were placed on Haldol and all 5 were restored to competency.  (*See id.* at 37-38.)  Narrowing it down further, Dr. Preston testified that two of her patients were diagnosed with paranoid schizophrenia and involuntarily medicated with Haldol, and these two patients were restored to competency.  (*See id.* at 41-42.)  Additionally, Dr. Sarrazin testified that out of the 25-30 people he has treated with Haldol for restoration of competency, 70-80 percent were restored.  (*See* May 21, 2007, Hr'g Tr. at 37.)

While it is not Defendant's burden to show that involuntary antipsychotic medication does not have a substantial likelihood of restoring Defendant to competency, the testimony of Defendant's expert, Dr. Carroll, adds little in support of the view that treatment will not be effective.  Dr. Carroll concluded that "[a]s the Defendant has demonstrated that he is 'hostile, paranoid, and uncooperative,' it is unlikely that forced medications will decrease his paranoid

---

[3] According to Dr. Preston, prior to the *Sell* decision in 2003, FMC Springfield did not differentiate between medicating individuals for competency restoration or for other purposes, such as *Harper*-type grounds.  (June 22, 2007, Hr'g Tr. at 35.)  Thus, prior to 2003, individuals that were involuntarily treated were subject to a "due process hearing," which included "competency restoration . . . as one of the criteria for medication," as well as *Harper*-type grounds.  (*See id.*)

1    thoughts." (Carroll Decl. at 3.)  Dr. Carroll states that "[f]orcing medications on him will likely

2    reinforce this level of paranoia," and "[w]hile the medications may improve his [disorganized

3    thinking], it is unlikely that they will improve his suspicious thoughts and will only increase

4    these thoughts." (*See id*.)  Dr. Carroll gave the opinion that "involuntary medication is not likely

5    to restore the Defendant to competence." (*See id*.; May 21, 2007, Hr'g Tr. at 76.)  Dr. Carroll

6    testified that "although the medications will calm him down and make him think more clearly . .

7    . [, the] paranoia is [not] simply just going to go away because that's more fixed in him, more of

8    a delusion than just thoughts that there are voices out there, that he actually has these beliefs."

9    (*See* May 21, 2007, Hr'g Tr. at 75-76.)

10        However, Dr. Carroll did not actually interview or observe Defendant.  Additionally, Dr.

11   Carroll could not cite to any specific studies for the contention that it would be likely that forced

12   medication would increase the delusions of someone with such a severe level of delusion. (*See*

13   June 15, 2007, Hr'g Tr. at 59.)  Dr. Carroll also testified that in the "vast majority of [his] cases,

14   [his opinion was that] the medication would restore [a person] to competency," and this included

15   individuals who had paranoid schizophrenia. (*See id*. at 18-19.)  Dr. Carroll has also never been

16   responsible for restoring someone to competency. (*See id*. at 19.)  His conclusion was based on

17   his opinion that "as a psychiatrist, [he asked himself]:  what is more likely to scare somebody [a

18   person wearing a helmet and a flak jacket or a nurse or someone in civilian clothing]?" (May

19   21, 2007, Hr'g Tr. at 106.)  This conclusion, he stated, was based on both common sense and his

20   medical opinion. (*See id*.)

21        Defendant also argues that the 1993 study used by Dr. Preston did not distinguish

22   between voluntary and involuntary medication of patients and thus, the 87 percent success rate is

23   suspect because voluntarily medicated individuals have a higher success rate. (*See* Def.'s Suppl.

24   Br. at 17-18.)  However, Dr. Preston testified that she wouldn't characterize the likelihood of

25   restoring people to competency when they are voluntarily medicated as *much* higher, and that

26   typically it is higher because those individuals are less ill and demonstrate better insight into

27   their illness. (*See* June 22, 2007, Hr'g Tr. at 30.)  Defendant also argues that Dr. Preston's own

28   clinical data should be broken down according to Defendant's specific diagnosis, paranoid

schizophrenia.  However, Dr. Preston testified that "with any of the psychotic disorders, whether it be schizophrenia, delusional disorders, schizo-effective disorder, or bipolar disorder with psychotic features, all of them have the same course of treatment, which would include antipsychotic medication." (*See* Apr. 23, 2007, Hr'g Tr. at 50.)  When asked if this would change the success rate, Dr. Preston testified "not meaningfully" and that there is "not a large difference at all." (*See id*. at 50-51.)  In fact, Dr. Sarrazin testified that "people that are paranoid delusional, paranoid psychotic, have a better outcome than people that are disorganized psychotic, schizophrenic, catatonic schizophreni[c], or undifferentiated paranoid" and that "if you are going to be schizophrenic, it's better to be paranoid schizophrenic." (*See id*. at 73-74.)

Additionally, Defendant argues that Defendant, who has a history of drug use including methamphetamine use, could have brain damage, in which case, Dr. Sarrazin testified that antipsychotic drugs will have no positive effect. (*See* Def.'s Suppl. Br. at 10; May 21, 2007, Hr'g Tr. at 38.)  However, there is evidence suggesting that Defendant has responded positively to antipsychotic medication in the past.

Accordingly, the Government has shown that Defendant has in the past responded positively to and become competent through the administration of antipsychotic medication, namely Risperdal.  Defendant, thus, has a history of competency while on antipsychotic medications.  Dr. Preston and Dr. Sarrazin also testified as to the specific medication plan proposed for Defendant based on Defendant's condition and history.  Additionally, Dr. Preston and Dr. Sarrazin both testified as to their high success rates with restoring individuals to competency.  Dr. Preston also testified to her high success rate on individuals with Defendant's diagnosis of paranoid schizophrenia and with the medication proposed for Defendant. Additionally, testimony demonstrates that success rates do not differ significantly based on the specific diagnosis of the patient or whether the patient was voluntarily or involuntarily medicated.  Thus, for the reasons discussed above, the Court **FINDS** that the Government has shown by clear and convincing evidence that involuntary medication is substantially likely to render Defendant competent to stand trial.

As discussed above, the Court "must [also] find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Sell*, 539 U.S. at 181.  Here, testimony demonstrates that the proposed medication is unlikely to have side effects which would interfere with Defendant's ability to assist in his trial.  Dr. Preston testified that "as the treating and evaluating psychologist, [she] would be monitoring Mr. Jaramillo's response to the medication, asking him if he were experiencing any types of side effects, and . . . working closely with Dr. Sarrazin." (*See* Apr. 23, 2007, Hr'g Tr. at 17.)  Dr. Preston testified that side effects of first generation medications include lethargy, restlessness in the feet or akathisia, and muscle stiffness. (*See id.* at 19.)  Dr. Preston testified that if lethargy would occur, Dr. Sarrazin typically moves the medication dosage to night time. (*See id.*)  Dr. Sarrazin also testified that while these can be very common early on, they usually resolve after two to four days, and can be helped by modifying the dose or adding other medications, such as cogentin and artane, to the regimen. (*See id.* at 69.)  Dr. Sarrazin also testified about the potential of dystonia or abnormal movements of the face or parts of the body. (*See id.* at 68.)  However, Dr. Sarrazin testified that they will likely inject the haloperidol with cogentin to reduce the likelihood of dystonias. (*See id.* at 69.)

Another potential side effect of first generation drugs is tardive dyskinesia, which is permanent and characterized by involuntary movements of the trunk and the face. (*See id.* at 19.)  However, Dr. Preston testified that it is unlikely that this would develop during the short period of time that an individual would be on the medication for competency restoration. (*See id.*)  Dr. Sarrazin also testified that tardive dyskinesia is more common in the higher dosages and longer periods of time and the incidence rate varies between 3 and 5 percent. (*See id.* at 70.)  Dr. Carroll agreed that this condition is more common in women and older individuals. (*See* June 15, 2007, Hr'g Tr. at 35.)  Another possible side effect is neuroleptic malignant syndrome where an individual's body is not able to regulate temperature and can cause muscle breakdown and kidney problems. (*See* Apr. 23, 2007, Hr'g Tr. at 70.)  However, this is a very uncommon side effect (less than 1 percent) and is reversible. (*See id.* at 70-71.)  Second generation antipsychotic

1  medications can have side effects such as sedation and lightheadedness that usually go away

2  over two to three days.  (*See id.* at 70.)  Another side effect is elevated glucose with diabetes.

3  (*See id.* at 71.)  However, this is most closely associated with cyprexa, which is not being

4  recommended for Defendant.  (*See id.* at 19.)  Also, Dr. Sarrazin testified that they monitor

5  monthly glucose levels, cholesterol levels, lipid profiles, and body weight.  (*See id.* at 71.)

6      Defendant also argues that while Springfield has a staff able to monitor Defendant at all

7  times, once Defendant attains competence and leaves the facility, he will no longer be

8  monitored.  (*See* Def.'s Suppl. Br. at 10.)  Dr. Preston and Dr. Sarrazin both testified that once

9  Defendant leaves Springfield, they will be unable to monitor his medical regime or side effects.

10  (*See* Apr. 23, 2007, Hr'g Tr. at 47; May 21, 2007, Hr'g Tr. at 48.)  However, Dr. Preston

11  testified that they "often try to coordinate with the Court proactively so that [they] minimize the

12  amount of time that they are sitting waiting for court proceedings" and in which time they could

13  stop taking the medication.  (Apr. 23, 2007, Hr'g Tr. at 47.)  Additionally, all monitoring will

14  not cease in pretrial facilities, as Defendant would be under the observance of prison staff.  In

15  the case that Defendant again becomes incompetent, the Court would declare Defendant as such

16  and stop trial proceedings.  Defendant also argues that minimizing the time that Defendant is in

17  San Diego prior to trial would deprive defense counsel of the much needed pre-trial access to

18  Defendant.  (*See* Def.'s Suppl. Br. at 10.)  However, Dr. Preston testified that accommodations

19  would be made for video conferencing.  (Apr. 23, 2007, Hr'g Tr. at 47.)  There is no indication

20  that this arrangement, while not ideal, would be insufficient.

21      While Dr. Preston and Dr. Sarrazin testified that antipsychotic medications have typical

22  side effects, these side effects generally resolve after two to four days and can be lessened by

23  modifying the dosage amount or the timing of the medication or by adding different

24  medications.  Additionally, the more serious side effects are rare and unlikely to occur in

25  Defendant's case.  Defendant's condition will also be actively monitored for any adverse

26  reaction to the medications.  Accordingly, the Court **FINDS** that the administration of the drugs

27  is substantially unlikely to have side effects that will interfere significantly with Defendant's

28  ability to assist counsel in conducting a trial defense.

### D.   *Necessity of Involuntary Medication*

"Third, the court must conclude that involuntary medication is *necessary* to further those interests.  The court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results."  *Sell*, 539 U.S. at 181 (emphasis in original).  As discussed above, the Government has an important governmental interest in restoring Defendant to competency in order to stand trial.  Additionally, evidence demonstrates that there is no alternative, less intrusive treatment that would achieve the same results.

Dr. Preston testified that "antipsychotic medication is necessary to restore the Defendant to competence."  (Apr. 23, 2007, Hr'g Tr. at 14.)  Dr. Sarrazin agreed that antipsychotic medications are necessary to restore Defendant to competency.  (*See id*. at 63.)  Dr. Preston also stated that she does not "believe that any alternative treatment available would alleviate his paranoid delusions or his auditory hallucinations."  (*See id*. at 21.)  Dr. Preston gave the opinion that "psychotherapy group treatment or education, although they could be helpful in their own right, they are not able to make delusions or hallucinations go away," and Defendant "is clearly uncooperative and unwilling to participate in individual psychotherapy."  (*See id*.)  However, if Defendant improves with medication, Dr. Preston hopes to move Defendant into an unlocked housing unit to participate in competency restoration group meetings.  (*See id*. at 22.)  Accordingly, "these other forms of treatment would really be complementary to a course of medication and not separate, on their own, sufficient to restore him to competency."  (*See id*.)  Dr. Carroll also agreed that there are no viable alternatives, with the same level of effectiveness, to antipsychotic medication, especially for someone with paranoia.  (*See* June 15, 2007, Hr'g Tr. at 14.)  Additionally, Dr. Preston and Dr. Sarrazin plan to first attempt to communicate to Defendant that a court order has been issued in the hope of having Defendant voluntarily comply.  (*See* Apr. 23, 2007, Hr'g Tr. at 22.)  However, based on Defendant's uncooperative behavior, this option is unlikely.

Accordingly, the Court **FINDS** that the Government has shown by clear and convincing evidence that there is no alternative, less intrusive treatment that would achieve the same results.

**E.**   ***Appropriateness of the Administration of the Medication in Light of Defendant's Medical Condition***

Lastly, "the court must conclude that administration of the drugs is *medically appropriate*, *i.e.*, in the patient's best medical interest in light of his medical condition." *Sell*, 539 U.S. at 181 (emphasis in original).  In evaluating this prong, the Court must consider that "[d]ifferent kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success." *Id.*

Defendant has been diagnosed with paranoid schizophrenia.  (*See* Apr. 23, 2007, Hr'g Tr. at 13, 63).  Dr. Preston testified as to Defendant's condition and found Defendant to be "very ill and unable to communicate meaningfully."  (*See id.* at 32.)  According to Dr. Preston, "at the present time, he is not on psychiatric medication, so his symptoms are very acute.  He is very paranoid, very psychotic."  (*See id.* at 42.)  Dr. Preston testified that "the current standard in the community for the treatment of schizophrenia is antipsychotic medication."  (*Id.* at 14.)  Dr. Sarrazin testified that it is clearly medically appropriate to treat Defendant's severe mental illness.  (*See id.* at 61.)  Defendant's expert, Dr. Carroll, also agreed that administering antipsychotic medications on Defendant is medically appropriate based on the records that he has reviewed.  (*See* May 21, 2007, Hr'g Tr. at 101.)  As indicated above, no alternatives exist with the same level of effectiveness for treating someone with paranoia.

As discussed above, Dr. Preston and Dr. Sarrazin testified at length as to the specific, potential side effects, the typicality of the side effects, and measures that will be taken to reduce the side effects.  While antipsychotic medications have common side effects, Dr. Sarrazin testified that these side effects generally resolve after two to four days and can be lessened by modifying the dosage amount or the timing of the medication or by adding different medications.  (*See* Apr. 23, 2007, Hr'g Tr. at 69.)  The more serious side effects are rare and unlikely to occur in Defendant's case.  (*See id.* at 19, 70-71.)  Additionally, Dr. Preston and Dr. Sarrazin will be actively monitoring Defendant's reaction to the medications.  (*See id.* at 17, 71.) The Springfield facility also has a 24-hour-a-day nursing and clinical staff to monitor individuals on medication.  (*See id.* at 30.)

25

1    Accordingly, having considered Defendant's current condition and the specific kinds of

2  antipsychotic medication that are proposed to be used on Defendant, the Court **FINDS** that the

3  Government has shown by clear and convincing evidence that administration of antipsychotic

4  drugs is medically appropriate.

5                                      *Conclusion*

6    For the reasons set forth above, the Court **GRANTS** the Government's Motion for Court-

7  Ordered Medication of Defendant for competency restoration.  Defendant's oral Request for a

8  Stay of this Order is **DENIED.**

9

10    **IT IS SO ORDERED.**

11

12  **DATED:  August 24, 2007**

13

14                                                  _____

15                                                  **HON. NAPOLEON A. JONES, JR.**
                                                    **United States District Judge**

16

17  **cc:  All Counsel of Record**

18

19

20

21

22

23

24

25

26

27

28